UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ERIK BRUCKER              )
                                    )
v.                            )       1:11-cv-75/1:08-cr-85
                                    )       *Judge Mattice*
UNITED STATES OF AMERICA  )

**<u>MEMORANDUM</u>**

Erik Brucker ("Brucker"), by and through counsel, has filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (Criminal Court Doc. 58).[1] Brucker contends he was deprived of his right to effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution. The United States opposes the motion (Criminal Court Doc. 61). Brucker has responded to the Government's opposition (Criminal Court Doc. 63).

The Court has determined that the § 2255 motion, answer, response, transcripts, and record of prior proceedings in the case conclusively establish that Brucker is not entitled to relief under § 2255 and, therefore, no evidentiary hearing is necessary. Rule 8(a) of the Rules Governing Section 2255 Proceedings in the United States District Courts. For the reasons that follow, the Court finds that this § 2255 motion should be **DENIED** (Criminal Court Doc. 58).

---

[1] Each document will be identified by the Court File Number assigned to it in the underlying criminal case.

# I.    STANDARD OF REVIEW

Section 2255 of Title 28 of the United States Code permits a prisoner in custody under sentence of a federal court to move the court that imposed the sentence to vacate, correct, or set aside that sentence, on the grounds: "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack . . . . " 28 U.S.C. § 2255.

Where a constitutional error is alleged, in order to obtain relief under § 2255 the record must reflect a constitutional error of such magnitude that it had a "substantial and injurious effect" or influence on the proceedings.  *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 637-38 (1993); *Watson v. United States*, 165 F.3d 486, 488 (6th Cir. 1999).  In other words, the standard is a high one, and constitutional mistakes will not be remedied under § 2255 unless they have had "substantial and injurious effect," that results in "actual prejudice." *Brecht*, 507 U.S. at 623.  As the Sixth Circuit has held, to prevail on a § 2255 motion, a movant "must allege one of three bases as a threshold standard:  (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."
*Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001), *cert. denied*, 535 U.S. 967 (2002).

This Court has jurisdiction in this matter under 28 U.S.C. § 1331.  The movant has the burden of establishing any claim asserted in the motion.  *See Bowers v. Battles*, 568 F.2d 1, 5 (6th Cir. 1977), *cert. denied*, 436 U.S. 910 (1978); *Mayes v. United States*, 93 F.

Supp. 2d 882, 886 (E.D. Tenn. 2000).  In addition, when deciding whether to grant a

§ 2255 motion the Court should draw all reasonable inferences from the evidence in a light

most favorable to the government. *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir.

1992) ("We review evidence and draw all reasonable inferences from it in a light most

favorable to the government when an appellant seeks post-conviction relief under § 2255."

(Citations omitted))

## II.    PROCEDURAL HISTORY

On July 22, 2008, a federal grand jury sitting in the Eastern District of Tennessee

at Chattanooga returned a three-count Indictment charging Brucker with devising a scheme

to defraud SunTrust Bank, a federally insured financial institution, in violation of Title 18

U.S.C. § 1344 (Criminal Court File No. 1).   The indictment included the following:

### The Scheme to Defraud

It was a part of the scheme and artifice to defraud that the defendant ERIK
BRUCKER*,* owner of Ducktown Dodge, would and did recruit a banker at
SunTrust Bank to facilitate the approval of car loans to Ducktown Dodge
customers by SunTrust Bank regardless of their credit worthiness in
exchange for payments and the free use of vehicles provided by Ducktown
Dodge.

It was further part of the scheme and artifice to defraud that after being
recruited and paid by the defendant, ERIK BRUCKER, a loan officer at
SunTrust Bank, Baron Mayes, would and did ensure that car loans were
made to Ducktown Dodge customers who were uncreditworthy, based on
false income information provided to Sun Trust Bank by Ducktown Dodge,
which information Baron Mayes knew was fraudulent.

### The Execution of the Scheme

On or about the dates listed below, in the Eastern District of Tennessee, the
defendant ERIK BRUCKER, executed and attempted to execute the scheme
to defraud set out above, in that on or about those dates, Brucker
intentionally caused fraudulent loan applications to be submitted for approval

by Ducktown Dodge to SunTrust Bank, where Baron Mayes knowingly caused their approval, as directed by Erik Brucker, despite the uncreditworthiness of the borrower, in the amounts listed below, each such instance constituting a separate count of this Indictment:

| Count | Customer | Date | Amount of Fraudulent Loan Application |
|-------|----------|------|----------------------------------------|
| One | M.L. | 09/14/2001 | $18, 582.00 |
| Two | T.L. | 10/20/2001 | $ 20,794.00 |
| Three | J.V. | 01/05/2002 | $ 14,531.00 |

(Criminal Court File No. 1).

Brucker went to trial on August 11, 2009. He was found guilty by a jury on all three counts on August 12, 2009. On July 26, 2010, Brucker was sentenced to the custody of the Bureau of Prisons on concurrent sentences of 27 months on Counts One, Two, and Three; a supervised release period of three years on Counts One, Two, and Three, all to run concurrently; and assessed a $300.00 special assessment (Criminal Court File No. 52). Judgment was entered on July 30, 2010 (Criminal Court File No. 53).

Brucker filed a motion for acquittal or in the alternative for new trial (Criminal Court File No. 26) and the Court denied the motion on July 26, 2010 (Criminal Court File No. 51). Brucker did not pursue a direct appeal. On March 30, 2011, Brucker timely filed this § 2255 motion (Criminal Court File No. 58).

## III.    FACTUAL BACKGROUND

### A.    Offense Conduct

The facts of the offense conduct are taken from the Presentence Invesitgation Report ("PSR"):

The Offense Conduct

6.      From January 2000 to July 2006, Erik Brucker was the owner of Ducktown Dodge. Ducktown Dodge was an automobile dealership located in Ducktown, Tennessee (population 427 in 2000 Census). This extremely rural area sits close to the Cherokee National Forest, the Ocoee River and the former Copper Hill mining area in Polk County, Tennessee.

7.      Beginning on May 29, 2001 and continuing through January 17, 2002, Ducktown Dodge employees sold vehicles to customers who would not legitimately qualify for loans through a scheme whereby customers' income was inflated and reported to SunTrust Bank. Once the scheme was identified, the United States Postal Inspector and the Federal Bureau of Investigation (FBI) of Chattanooga were notified and an investigation began. Results from the investigation revealed that SunTrust Bank officer Baron Mayes was in on the scheme and facilitated the fraudulently obtained loans by approving the loans without supporting documentation. The dealership's owner, Erik Brucker, finance manager Albert Powell and sales manager Matt Kavanaugh were also in on the scheme which targeted persons with poor credit history. Mr. Mayes was provided a demonstration vehicle and $2,000 per month for his services in the conspiracy.

8.      Ducktown Dodge would forward falsified bank loan applications to Mr. Mayes for his approval. During Mr. Mayes' employment with SunTrust, he was an indirect lender and underwriter. He dealt directly with several automobile dealers in the Eastern District of Tennessee. Mr. Mayes handled all of the Ducktown Dodge loans resulting in a total loan value of $1,246,705.04 involved in the instant offense. Sun Trust Bank recovered part of the loan values due to mostly repossessing the vehicles and selling them for a reduced price. The bank suffered a monetary loss of $600,893.22. However, they have recovered $469,079.50 of the loss amount. Therefore, SunTrust is due $131,813.72 in restitution.

9.      Mr. Mayes resigned from SunTrust Bank in 2003. After Mr. Mayes left, Mr. Brucker had to turn to other means to obtain the fraudulent loans. Albert Powell was not employed with Ducktown Dodge until after Baron Mayes left SunTrust Bank. However, during his employment with Ducktown Dodge, Mr. Powell was instructed by Erik Brucker to create false tax returns, pay stubs and other fraudulent documents to support the car loan applications of customers, unbeknownst to the customer. Mr. Powell told Matt Kavanaugh that he composed the tax returns on a computer and submitted the bogus returns to banks, mostly Capital One. Mr. Powell also submitted false invoices to banks reflecting a higher price tag for vehicles. There were approximately 20 fraudulent loans submitted to Capital One. At the time Mr. Powell was sentenced, Capital One had no loss or restitution

because none of the loans were in default status.  Erik Brucker's scheme was discovered and began to unravel as a result of the falsified documentation submitted to banks when his SunTrust Bank co-conspirator left his employment at SunTrust.  The loan officers at the various banks began to question the submitted loan documents and supporting documentation.

10.     The individual customers also suffered losses in the amount they had to pay for loans that should have never been approved to receive.  In addition, they have experienced loss of their vehicle(s), loss of employment and many had to file for bankruptcy as a result of the position these fraudulent loans placed them in financially.  The amount these victims suffered is not included in the restitution amount and do not include the intangible losses to the various credit history scores, loss of personal property, employment and many other losses connected to the financial hardship they were placed in.

(PSR, pp. 4-5).

### B.     Trial Evidence

To put Brucker's claims into perspective, it is necessary to review the factual background of the challenged spreadsheet that became Government Exhibit M-1 and some of the challenged testimony supporting the allegations that Brucker was involved in this alleged scheme.

### 1.     _History of Exhibit M-1_

Prior to trial, Brucker's counsel filed a motion in limine, seeking to exclude evidence of all acts other than those charged in the indictment, arguing the Federal Rules of Evidence 403 and 404 prohibited the introduction of such evidence (Criminal Court File No. 16, Motion in Limine).  Specifically, counsel sought to exclude evidence concerning a 2005 fraud scheme involving Albert Powell, then finance manager at Ducktown Dodge (Criminal Court File No. 16).  During the hearing, however, the Court stated, "[i]n this case, I'm going to rule any evidence that the government presents relating to the time period of May 2001

6

through January 2002, [the government is] going to be put on very firm ground." (Criminal Court File No. 40, p. 15). Trial counsel argued the government was required to confine its proof to the four corners of the indictment which charged the scheme to defraud occurred from about May 2001 through about January 2002 (*Id*. P. 17).

In sum, the Court held that the government could introduce evidence relating to the scheme to defraud SunTrust Bank with banker Baron Mayes, from May 2001 through January 2002 but barred them from presenting evidence of fraudulent loan applications which had been submitted to other banks or after January 2002.

During trial, Stephanie Hardeman, a security manager at SunTrust Bank, testified that she created Government Exhibit M-1, a summary document of the defaulted loans approved by Baron Mayes, from Ducktown Dodge (Criminal Court File No. 41, pp. 117-128). She also testified as to certain alterations that were made in documents related to some of the defaulted loans listed in Exhibit M-1 (Id. at 105-124). The M-1 exhibit represented all of the loans (58) Baron Mayes approved from Ducktown Dodge that were not paid and the bank took a loss on during the nine month period from May 29, 2001, to January 17, 2002 (Id. at 124).

Baron Mayes, who had previously pled guilty to facilitating the fraudulently obtained loans by approving the loans without supporting documentation for Ducktown Dodge from May of 2001 through January 2002, testified he was involved with the loans identified in Exhibit M-1 (Criminal Court File No. 41, p. 149). Mayes testified he received demo vehicles to drive and, subsequently, payments from Ducktown Dodge in exchange for approving unqualified loan customers. Mayes testified he was approving loans in the late spring and probably had the first free demo vehicle in early summer. He was given three

vehicles over a six to seven month period and then began receiving money in addition to the demo vehicles–first receiving a $2,000.00 cash payment and then three $2,000.00 payments by checks signed by Brucker, one of which Brucker delivered to him in his office while he was working at the bank (Criminal Court File No. 41, p. 61-131).

### 2. *Testimony of Ducktown Dodge Employees*

Leonard Parker, Brucker's general manager of Ducktown Dodge during this time, testified the scheme began when Brucker asked him if they could get Mayes "on the take" and he called Mayes and asked him (Criminal Court File No. 41, p. 162). Parker testified Brucker suggested giving Mayes a demo car to drive free of charge and they did so and during the time of the scheme Mayes was given three different cars by Parker with Brucker's approval. Parker also testified it was Brucker's idea to start paying Mayes $2,000.00. The first payment was $2,000.00 cash, paid in October of 2001 at Ye Olde Steakhouse between Pigeon Forge and Knoxville. In November of 2001, Parker testified that he and Brucker went to SunTrust Bank in Maryville and Brucker handed Mayes a check (Criminal Court File No. 41, p. 182-83). The other two payments were checks on the Ducktown Dodge account signed by Brucker. The checks were to pay Mayes for buying the car loans of their uncreditworthy customers (Criminal Court File No. 41, pp. 163-165). The checks were made out to MCF which was a business that was set up by Mayes as a cover and depository for the checks (*Id*. at 170-71).

Parker explained that if a customer's income was too low to qualify for a loan, it was the company's practice to give that customer "an income raise" by falsely reporting their income on the loan application as greater than what the customer had actually told them. Parker testified Brucker was involved in conversations regarding uncreditworthy customers

8

and told them (the employees) the customer needed "a raise" which Parker described as "chang[ing] their income on their credit application." (*Id.* at 167). Parker testified everyone in the Ducktown Dodge dealership knew "we had SunTrust on the take [and] Baron on the take." (*Id.*).

Parker further testified that he and Brucker parted ways when Parker resigned and walked out from Ducktown Dodge on Brucker's birthday, October 7, 2004. In June of 2005 he decided to expose the scheme and contacted SunTrust Bank, Cap One, Bank of America, and Drive Financial. Parker and his attorney then met with FBI Agent Stan Ruffin and Parker explained the scheme in which he was involved while working at Ducktown Dodge (*Id.* at 169-170).

Albert Powell was Ducktown Dodge finance manager from January 2003 through December 2005. Powell testified he heard Brucker brag about bribing Mayes on several dozen occasions(*Id.* p. 185). Gene Faust, Ducktown Dodge's general sales manager from March 2001 to September 2005, testified that on one occasion Parker and Brucker were in Parker's office, and Parker called Powell into his office directed him to get another car ready so he and Brucker could go to Knoxville to exchange vehicles with Mayes and bring him some money to get some loans approved (Criminal Court File No. 41, p. 207).

Several customers testified about rent, mortgage, and/or income information that was incorrect on their applications that they had not written in nor provided to obtain the vehicle loan. (Id., pp. 218-243).

Represented by new counsel after his conviction, Brucker filed a motion for acquittal or in the alternative, a motion for new trial (Criminal Court File No. 43). Brucker requested

a new trial claiming the admission into evidence of Exhibit M-1 was plain error; the admission into evidence of testimony from multiple witnesses that Brucker "knew" of the "scheme and artifice to defraud" SunTrust Bank as alleged in the indictment was plain error; and the Court's charge to the jury that Brucker was charged with the same crime as three convicted felons who testified at trial was plain error (Criminal Court File No. 43).

The Court denied the motion, finding the government was entitled to introduce evidence to place the three loans actually charged in the indictment within the context of a larger scheme. The Court specifically explained:

> As to the potential unfairly prejudicial effect that Exhibit M-1 may have had on the jury, the court notes that Mr. Brucker's trial counsel was afforded ample opportunity to cross-examine Ms. Hardeman about the exhibit, and the methodology she used to create it. While Mr. Brucker now invites the Court to speculate regarding possible problems with the exhibit, the Court declines such invitation in the absence of any evidence whatsoever to support such suggested - or imagined - problems.

(Criminal Court File No. 51).

The Court also noted the government was required to introduce evidence of Brucker's knowledge of the fradulent scheme and that at least a portion of the testimony of which Brucker complained about would have been admitted and additionally, trial counsel may have had strategic reasons for not objecting. The Court declined to speculate as to the soundness of Brucker's trial strategy and speculate as to what it might have done had any such objection been asserted (Court File No. 51).

## IV.    ANALYSIS OF CLAIMS

Brucker raises one claim of ineffective assistance of counsel–supporting it with facts of two different instances of alleged ineffective assistance–and one cumulative error claim

10

in his § 2255 motion.  The Court will address each claim after reviewing the law applicable to ineffective of assistance of counsel claims.

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel.  *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.  As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the movant.  *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.  A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Id*. at 690.  The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at

the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986).

The second prong of the *Strickland* test requires the petitioner to show counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The *Strickland* Court emphasized both prongs must be established in order to meet the claimant's burden, and if either prong is not satisfied the claim must be rejected. The Court further explained:

> Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.

Id. at 697.

### A. Counsel's Failure to Object and Request Limiting Instruction for Government's Exhibit M-1

Brucker claims Government Exhibit M-1 was irrelevant, contained inadmissible hearsay, was not an accurate summary of voluminous evidence, and introduced inadmissible evidence of other misconduct. Specifically, he argues Government's Exhibit

M-1, which purportedly summarized bad loans made by SunTrust Bank to Brucker's uncreditworthy auto dealership customers, was inadmissible under Fed. R. Evid. 402, 404(b), 406, and was inadmissible as unfairly prejudicial under Rule 403. In addition, he argues the government failed to give notice of its intent to use this exhibit as required by Rule 404(b) under certain circumstances.

Finally, Brucker argues that although "the related testimony of Hardeman communicated to the jury that all 58 (or 59) of the loans (not just the three for which he was indicted) were a result of fraud on the part of Defendant Brucker[,] . . . there was no evidence at all that 51 (or 52) of the loans involved altered loan applications." (Criminal Court File 58, p. 22 0f 38). On one hand Brucker argues that "[a]lthough she was not qualified as a handwriting or document expert, Hardeman testified that the applications for seven of the loans listed on Exhibit M-1 showed what appeared to her to be changes in the figures for expenses and/or income[,]" and on the other hand he argues "there was only evidence that only three of the applications (those of Lowdermilk, Langford, and Vines) were altered in any scheme that a jury could reasonably attribute to Brucker." (Criminal Court File No. 58, p. 22 of 38).

The Government claims that even before Brucker was indicted, the government met with him, discussed its proof of his participation in a fraudulent scheme, and showed him a spreadsheet of defaulted Ducktown Dodge loans, a spreadsheet that later became Government Exhibit M-1. In addition, the government claims it met with Brucker again along with his court-appointed counsel, after indictment and discussed the evidence, including all of the loans referenced in Exhibit M-1. The Government argues the summary exhibit was relevant and admissible; counsel objected to this evidence prior to trial and it

was the subject of a motion *in limine* and two pretrial hearings; counsel had strategic reasons for not objecting; and, even if counsel was deficient and the evidence should have been excluded, there has been no showing of a reasonable probability that the result of the proceeding would have been different because the exclusion of Exhibit M-1 would not have required an acquittal.

The government is mistaken in its contention that this exhibit was the subject of a motion *in limine* and two pretrial hearings, as there was no mention of Government's Exhibit M-1 in either the motion or the hearings concerning the motion *in limine* filed by defense counsel. Rather, trial counsel's motion *in limine* sought to exclude evidence concerning a 2005 fraud scheme involving Albert Powell, then finance manager at Ducktown Dodge (Criminal Court File No. 16). Nevertheless, although the government's Exhibit M-1 was not specifically mentioned when the Court ruled on the motion *in limine*, the Court stated: "In this case, I'm going to rule any evidence that the government presents relating to the time period of May 2001 through January 2002, they're going to be put on very firm ground." (Criminal Court Doc. 40, p. 15)

Brucker argues counsel should have argued Exhibit M-1 was irrelevant and inadmissible under Rules 402, 404(b), and 406 of the Federal Rules of Evidence as there is no proof all fifty-eight (58) of the loans identified on this exhibit actually involved fraud even though the government argues that is the case. Thus, it appears Brucker needs to show that not all of he loans were actually involved in the fraud in order to show he suffered prejudiced. He has not done so.

A careful review of the transcript reveals Ms. Hardeman explained that Exhibit M-1

represented loans from Ducktown Dodge that were not paid and on which SunTrust Bank took a loss from May 2001 through January 2002 (Criminal Court File No. 41, p. 124). In addition, Ms. Hardeman explained that only a few payments were made on most of the loans before payment ceased. When asked if the cessation of payment indicated the loans were never good, she responded "[r]ight." (Criminal Court File No. 41, p. 125). Although that appears to be the extent of the government's proof that each loan listed on Exhibit M-1 was a fraudulent loan, counsel was apparently aware that the evidence in Exhibit M-1 listed only fraudulent loans as he questioned Ms. Hardeman about the "59 bad loans, fraudulent loans that Mr. Mayes was involved with[.]" (Criminal Court File No. 41, p. 128). In addition, he cross-examined Mr. Parker about Mr. Mayes approving bad loans in May through October of 2001 without receiving any money (Criminal Court File No. 41, p. 182).

Although Brucker argues there is no evidence that 51 of the loan applications were altered or that they were altered either by Brucker or by someone else pursuant to any scheme to defraud SunTrust, he provides no evidence that the loans were not altered or fraudulent or any factual support demonstrating the evidence was inadmissible. Brucker has the burden of overcoming the strong presumption that counsel provided effective assistance. *Strickland*, 466 U.S. at 689. In order to meet his burden of demonstrating he is entitled to §2255 relief, Brucker must provide factual support for his allegations and conclusory allegations are insufficient. *See United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994). Consequently, Brucker has failed to provide factual support for his allegations, and has failed to overcome the presumption that counsel's approach was sound trial strategy. Nevertheless, even assuming without deciding that trial counsel was

deficient in failing to object to the exhibit, Brucker has failed to establish a reasonable probability that the outcome of his trial could have been different had his attorney made an objection.

A movant collaterally attacking his sentence or conviction pursuant to § 2255 has the burden of proving the grounds for collateral attack by a preponderance of the evidence. *See Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958); *Wright v. United States*, 624 F.2d 557, 558 (5th Cir. 1980); *United States v. Stifel*, 594 F.Supp. 1525, 1528 (N.D. Ohio, 1984); and *McNeil v. United States*, 72 F.Supp.2d 801 (N.D. Ohio, 1999). As previously noted, when deciding whether to grant a § 2255 motion the Court should draw all reasonable inferences from the evidence in a light most favorable to the government. *Carnine v.United States*, 974 F.2d at 928.

Although the evidence that Exhibit M-1 contained only fraudulent loans is scant, the burden is on Brucker to prove his alleged claims, and he has not demonstrated that any of the loans listed in Exhibit M-1 were not the result of fraud or part of the scheme to defraud SunTrust Bank. Not only has Brucker not provided any facts from which the Court could infer the evidence in Exhibit M-1 was not part of the scheme to defraud, even if counsel had objected to the introduction of Exhibit M-1 and the Court had sustained the objection to the government's exhibit, the government's other evidence amply supports Brucker's convictions. Thus, subtracting the summaries of each of the fifty-eight (58) loans, i.e., Government's Exhibit M-1, from the government's proof would not have substantially altered the weight of evidence against Brucker.

In sum, Brucker has failed to establish that he suffered any prejudice by his

attorney's decision not to object to Government Exhibit M-1 as he has not demonstrated the evidence was unfairly prejudicial. Consequently, he has not demonstrated a reasonable probability that the outcome of his trial would have been different had counsel objected to this evidence.

Likewise, Brucker has failed to demonstrate that a limiting instruction was necessary or that he was prejudiced by counsel's failure to request a limiting instruction.[2] Brucker has failed to provide any evidence that, but for counsel's failure to request a limiting instruction, there is a reasonable probability the outcome of his trial would have been different. Accordingly, Brucker's claim that counsel rendered ineffective assistance of counsel when he failed to object to Government's Exhibit M-1 and/or request a limiting instruction fails and § 2255 relief is **DENIED**.

## B.    Failure to Object to Testimony

Brucker complains that counsel failed to object to testimony from various witnesses who testified he knew of the alleged scheme to defraud. Brucker argues this testimony was irrelevant under Fed. R. Evid. 402, unfairly prejudicial under Rule 403, not based on personal knowledge under Rule 602, inadmissible lay opinion testimony under Rule 701, inadmissible hearsay under Rule 802, and in violation of *Crawford v. Washington,* 543, U.S. 1095 (2005). Notably, Brucker makes only the above passing reference to the reason

---

[2]      The Court did instruct the jury as follows:

During the trial you may have seen counsel use presentations and summaries which were offered to assist you in the presentation and understanding of the evidence. This material is not itself evidence and must not be considered by you as proof of any facts. (Criminal Court Doc. 42, p. 296).

the evidence of each witness was inadmissible but has failed to explain how the complained-of testimony violated each of the rules he mentioned.   Because Brucker references different opinion testimony of the witnesses that Brucker knew about the fraudulent scheme, the Court assumes that he is claiming the opinion evidence was improperly admitted.   Federal Rule of Evidence 701 provides for opinion testimony by lay witnesses:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinons or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

As the advisory committee notes explain, Rule 701 opinion testimony based on a person's "particularized knowledge that the witness has by virtue of his or her position in the business[]" is admissible.   (2000 Amendment).

Moreover, pursuant to Rule 701, "lay witnesses may state their understanding of the use of another person's statements 'only if rationally based on the perception of a witness and helpful either to an understanding of the testimony of the witness on the stand or to the determination of a fact in issue." *United States v. De Peri*, 778 F.2d 963, 977 (3rd Cir. 1985) (quoting *United States v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980), *cert. denied*, 454 U.S. 844 (1981).

In the instant case, the statements of which Brucker complains are the witnesses' opinions based upon their direct interaction with Brucker and his business and are helpful to the determination of Brucker's involvement in the fraudulent scheme.   A review of the

record reveals the lay opinion testimony was rationally based on the witnesses perceptions. For example, Brucker complains about Mayes testimony that Brucker knew "what was going on . . . with these checks."  A review of the transcript reflects that Mayes was explaining what he received for approving Ducktown Dodge's uncreditworthy customer loan applications.

First Mayes explained about the three free demo vehicles he received over a six to seven month period.  Second, he testified about the checks he received from Ducktown Dodge, the dates of the checks, and who signed the checks.  Third, Mayes explained he constructed a fake business as a front and place to hide the money.  Next, Mayes explained the particular circumstances surrounding each payment.  Mayes specifically explained that Brucker signed all three checks, and Brucker personally handed the third check to Mayes at SunTrust Bank.  Mayes further explained there was no work to be done for the money and demos except to approve unqualified customers for loans.

The prosecutor referenced Brucker delivering the check to Mayes and asked whether, based on Mayes observation, Brucker knew the purpose of the checks. Mayes explained that it was his opinion, based upon his dealings with Brucker, that he knew the purpose of the checks and he knew of the fraudulent loans because Brucker signed all three checks; personally handed Mayes one of the checks; there was no work done or requested for the money; and Brucker knew he was the banker approving the loans.  In addition, Mayes testified that because of the way a dealership works, Brucker would also have had to known he was being loaned demo vehicles.  Finally, Mayes explained that Parker was Brucker's right-hand man and because they were getting unqualified customers approved, he was sure Mr. Parker and Brucker would have been discussing that business

as he had observed their relationship to be "very close." (Criminal Court File No. 41, pp. 131-136).

Mayes testimony consisted of opinion testimony rationally based on his perception, helpful to determine a fact in issue, i.e., Brucker's involvement in the scheme to defraud, and not based on any prohibited specialized knowledge. The challenged testimony expressed the witnesses' understanding of conduct and statements which he perceived as a major party to the fraudulent scheme. The inferences which Mayes drew from the relevant conduct and statements were rationally based on his perception of what he observed and heard.

Nevertheless, even if trial counsel had objected to the government asking Mayes if Brucker knew what was going on with these checks and the Court sustained the objection, Mayes' other testimony was admissible and was sufficient for the jury to conclude Brucker knew and was involved in the fraud. Thus, it appears that Mayes opinion testimony pursuant to Rule 701 was not erroneous as it was based on inferences which he drew from Brucker's conduct and statements, and Mayes' opinions were rationally based on his perception and helpful to the determination of a fact in issue. Nevertheless, even assuming counsel was deficient for failing to object to such testimony, Brucker has not demonstrated that but for counsel's failure to object to the testimony there is a reasonable probability the outcome of the trial would have ben different.

Consequently, Brucker has not demonstrated he suffered the type of prejudice required by *Strickland* as the result of counsel's alleged deficient performance. Accordingly, because Brucker has not demonstrated a reasonable probability that the outcome would have been different, relief is **DENIED** on his claim counsel failed to object to Mayes opinion

testimony.

Next, Brucker complains about Parker's testimony. Parker testified he was the general manager, right under Brucker and the second in command at Ducktown Dodge. Parker explained that the illegal relationship with Mayes began when Brucker asked Parker if he could get Baron on the take and Parker called Mayes and asked him. Mayes agreed, and at Brucker's suggestion, Parker offered Mayes a demo car which he took. Parker later testified they started paying Mayes $2,000 a month which was Brucker's idea as Brucker gave Parker a check made out to Baron Mayes for $2,000.00 to take him (Criminal Court File No. 41, pp. 154-165).

Once again, Brucker has not explained how this opinion testimony is impermissible. Parker testified as to his personal perceptions based upon his observations and discussions with Brucker and his personal relationship with him. Accordingly, not only has Brucker failed to demonstrate counsel performed deficiently, he has failed to demonstrate that but for counsel's failure to object to the testimony there is a reasonable probability the outcome of the trial would have been different.

Brucker's claims against Plonsky and Faust likewise fail to explain why the opinion testimony was inadmissible. Plonsky worked at Ducktown Dodge at various times during 2001 through 2005 and he testified that Parker or someone else would fill in the numbers on the loan applications "so people's income made them worthy of getting the car." Customers would provide financial information verbally and they would leave the income information blank to be completed at a later date by different people at Ducktown Dodge. Plonsky explained that at Ducktown Dodge it was common to hear the comment that "this guy needs a raise[,]" and it meant "[t]hat he didn't make enough money, they had to show

more money on the credit application in order for him to qualify to guy a car." (Criminal Court File No. 41, pp. 197-98).

The admission of Plonsky's and Faust's lay opinion testimony appears to have been properly admitted. Even assuming counsel was deficient for failing to object to such testimony, Brucker has failed to establish a reasonable probability that, had counsel objected and the testimony been precluded, the result of the trial would have been different.

In sum, it appears the challenged witnesses had sufficient first-hand knowledge of the matters upon which they gave their opinion to satisfy Fed. R. Evid. 701's admissibility standard. Nevertheless, even assuming the failure to object to the introduction of this evidence was deficient performance, Brucker has not demonstrated that prejudice to the outcome of the trial flowed from admission of this evidence. Accordingly, relief is **DENIED** on Brucker's ineffective assistance of counsel claim relating to counsel's alleged failure to object to the lay opinion testimony.

## C. Cumulative Error

Brucker's final argument is that the combination of the two alleged errors of counsel amounts to a constitutional error. "Under cumulative-error analysis, 'a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair.'" *United States v. Warman*, 578 F.3d 320, 349 (6th Cir. 2009) (quoting *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004)(where defendant failed to identify any error to combine with an incident ofh armless error, defendant could not show that he was "denied a fundamentally fair trial"). "A cumulative-error analysis should evaluate only the effect of matter[s] determined to be in error, not the cumulative effect of

non-errors." *United States v. Conteh*, 234 Fed. Appx. 374, 389 (6th Cir. 2007). For the reasons explained above, the Court has concluded there was no merit to Brucker's alleged errors. Consequently, Brucker cannot establish cumulative error.

## V.     CONCLUSION

For the reasons set forth above, the Court concludes Brucker has failed to present any facts which establish that his conviction or sentence is subject to collateral attack under 28 U.S.C. § 2255. Accordingly, Brucker's § 2255 motion [Court Doc. 58] is **DENIED**.

A separate judgment will enter.


         */s/Harry S. Mattice, Jr.*
         HARRY S. MATTICE, JR.
         UNITED STATES DISTRICT JUDGE